[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 26, 2007
THOMAS K. KAHN
CLERK

_____

No. 07-10521

_____

D.C. Docket No. 06-00084-CV-J-32-MCR

JACKSON-SHAW COMPANY,
a Texas corporation,

                                        Plaintiff–Appellant,

versus

JACKSONVILLE AVIATION AUTHORITY,
a body politic and corporate,

                                        Defendant–Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(November 26, 2007)**

Before BIRCH and BARKETT, Circuit Judges, and KORMAN,* District Judge.

PER CURIAM:

Jackson-Shaw Company appeals from a final judgment, after a bench trial, in favor of the Jacksonville Aviation Authority ("JAA") on Jackson-Shaw's suit seeking a declaratory judgment and injunctive relief. In its Complaint, Jackson-Shaw alleges that a development agreement ("Agreement") between the JAA and a private entity, Majestic Realty Company,[1] violates article VII, section 10 of the Florida Constitution, and as a result, the JAA must be enjoined from performance under the Agreement. Specifically, Jackson-Shaw alleges that the Agreement makes the JAA a "joint owner" with Majestic and requires the JAA to pledge to Majestic its public credit, both of which are prohibited by article VII, section 10 of the Florida Constitution. Because resolution of these important constitutional questions depends on unsettled state law, we believe it prudent to certify the questions presented here to the Florida Supreme Court.[2]

---

* Honorable Edward Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[1] The Agreement at issue in this case is between the JAA and Woodwings East Development, LLC, a Delaware limited liability company formed by Majestic.

[2] The Florida Constitution permits us to certify a question to the Florida Supreme Court if it "is determinative of the cause and for which there is no controlling precedent of the supreme court of Florida." Fla. Const. art. V, § 3(b)(6); see also Stevens v. Battelle Memorial Inst., 488 F.3d 896, 904 (11th Cir. 2007). We have also previously said that "[s]ubstantial doubt about a question of state law upon which a particular case turns should be resolved by certifying the

## I. BACKGROUND

The JAA is a public entity responsible for the management, development, and oversight of four airports in Duval County, Florida, including the Jacksonville International Airport and certain public lands surrounding it. The JAA has approximately 4000 to 6000 acres of land available for development, depending on the configuration of possible future runways. As part of that portfolio, the JAA owns a 328-acre unimproved lot known as Woodwings East. After negotiations with a large-scale developer failed in the late 1990s, the JAA decided that the highest and best use of the land would be realized through a lease of the property. Rather than seeking bids on Woodwings East, or requesting development proposals, or having the property appraised or marketed directly, the JAA simply erected "For Lease" signs on the property. After seeing one of these signs on the property, Majestic sent the JAA a proposal in March 2005 to lease the property, and after some negotiations, the parties reached the Agreement which is the subject of the present appeal.

The Agreement contains two major parts: an Option to Ground Lease

---

question to the state supreme court." Jones v. Dillard's, Inc., 331 F.3d 1259, 1268 (11th Cir. 2003); see also Raborn v. Menotte (In re Raborn), 470 F.3d 1319, 1324 (11th Cir. 2006); Tobin v. Mich. Mut. Ins. Co., 398 F.3d 1267, 1274 (11th Cir. 2005) ("Where there is doubt in the interpretation of state law, a federal court may certify the question to the state supreme court to avoid making unnecessary Erie guesses and to offer the state court the opportunity to interpret or change existing law.").

("Option") and a Participating Ground Lease Agreement ("Lease Agreement").

Under the Option, the JAA granted Majestic the right/option, for a term not to

exceed fifteen years,[3] to lease the Woodwings East premises at no cost to Majestic.

If Majestic exercised the Option, the JAA would lease a portion of the Woodwings

East Option parcel to Majestic under the Lease Agreement for a sixty-five year

term.[4]  Majestic agreed to design, finance, construct, manage, lease, and operate

the new buildings constructed on the Lease Agreement premises, but the "net

revenue"[5] produced by the leased improvements would be split evenly between the

---

[3] In order to prevent "land banking," the initial Option term was for five years.  The term was to be extended one year for every 100,000 square feet of income-producing properties that Majestic constructed on the Option premises for up to fifteen years.

[4] After all amendments were made to the Agreement, an updated Option and Lease Agreement were provided to the JAA board of directors, which they approved at a September 2006 meeting.  The summary of the Agreement reads as follows:

> The Option to Ground Lease Agreement (Option) grants Majestic a five year right/option to ground lease the Woodwings East premises (Option Premises). The Option term can be extended by one (1) year for every 100,000 square feet of commercial buildings substantially completed within the Option Premises up to the maximum term of fifteen (15) years.  Substantially completed means the roof and exterior walls for the proposed commercial building have been completed.
>
> The Participating Ground Lease (PGL) comes into effect when Majestic elects to exercise the Option and take down a portion of the Option Premises.  Under the PGL JAA leases the portion of the Option Premises taken down for a lease term of sixty-five (65) years.

[5] "Net revenue" is to be determined after Majestic is reimbursed from gross revenue for all management fees, pre-development, construction, design, maintenance, financing, infrastructure, and other costs and "advances"—all with interest—as well as all "fixed rent" paid.

JAA and Majestic. However, under the terms of the Lease Agreement, the JAA would only begin receiving its share of "net revenue" after Majestic had fully paid off all of its costs, including development, capital, and administrative expenses. Additionally, the JAA agreed to pay $750,000 to construct a road extension into the parcel and to provide Majestic with up to fifty acres of "wetlands mitigation" credit valued at $1.8 million, should it prove necessary to complete the project. With both the 15-year option period and 65-year lease, the Agreement between Majestic and the JAA was projected to last 80 years.

Jackson-Shaw is a large private real-estate developer and competitor of Majestic. It owns, among many other things, a nearby parcel of land called "Tradeport," which it purchased from the JAA in 2005 for $109,000 an acre, at a total price of $58,215,000. Despite its ownership of neighboring property, Jackson-Shaw learned about the Woodwings East deal between Majestic and the JAA only after it was reported in the news.[6] Jackson-Shaw then brought suit against the JAA, seeking declaratory and injunctive relief. The only claim relevant to this appeal is Jackson-Shaw's allegation that the Agreement violates the Florida Constitution's prohibition against a government entity becoming a

---

[6] Jackson-Shaw contends that it never knew that the property was available in the first place, except perhaps under short-term leases which it believed would be uneconomic. After initiating this litigation, Jackson-Shaw submitted its own proposal to develop the parcel.

"joint owner" with, or giving, lending, or using credit to aid, a private corporation. See Fla. Const. art. VII, § 10.

Following a bench trial, the district court sided with the JAA, finding that "[w]hile reasonable persons may certainly disagree whether the JAA–Majestic transaction is good public policy, [the JAA's] action in approving it does not run afoul of the Florida Constitution, Florida Statutes, or [the] JAA's Charter." D. Ct. Op. at 100.

The Florida Constitution limits a public body's ability to enter into certain business relationships with private entities in several ways. It absolutely forbids the state from becoming a "joint owner" of a project with a private company or from pledging public funds and credit for the benefit of a private company absent a paramount public purpose. Article VII, section 10 of the Florida Constitution provides in pertinent part:

> Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person . . . .[7]

In response to Jackson-Shaw's claims that the Agreement is unconstitutional, the JAA argues, in part, that the Agreement is merely a long-term lease, and does not

---

[7] The remainder of section 10 lists exceptions to the general rule. The parties have not argued that any of these exceptions are relevant here.

involve joint ownership or a pledge of public credit. It specifically notes that upon the advice of counsel—who was concerned about the Florida Constitution's "joint owner" prohibition—the JAA and Majestic added a term to the Agreement guaranteeing the JAA a fixed minimum rent of $1380 per acre per year unless and until its share of net revenue exceeded that amount.[8] The JAA argues that the addition of the fixed minimum rent component to the Agreement, which gave the JAA a guaranteed return, negates the conclusion that it is a joint owner.

Article VII, section 10 of the Florida Constitution was adopted in 1974 to replace an earlier provision, which stated in relevant part:

> The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual.

Fla. Const. art. IX, § 10 (1885).[9] Interpreting this predecessor provision—which is substantially similar to the current provision except for the latter's explicit prohibition on the state being a "joint owner"—the Florida Supreme Court

---

[8] The parties arrived at that figure by calculating the value of a seven-percent return on a $16,000 per-acre value, which was the value of a nearby property that the JAA was separately negotiating to purchase.

[9] This text was originally introduced as an amendment to the Florida Constitution of 1865, and was then carried over into the 1885 Constitution. A 1968 amendment added four exceptions.

explained in 1926:

> The reason for this amendment was that, during the years immediately preceding its adoption, the state and many of its counties, cities, and towns had by legislative enactment become stockholders or bondholders in, and had in other ways loaned their credit to, and had become interested in the organization and operation of, railroads, banks, and other commercial institutions. Many of these institutions were poorly managed, and either failed or became heavily involved, and, as a result, the state, counties and cities interested in them became responsible for their debts and other obligations. These obligations fell ultimately on the taxpayers. Hence the amendment, the essence of which was to restrict the activities and functions of the state, county, and municipality to that of government, and forbid their engaging directly or indirectly in commercial enterprises for profit.

Bailey v. City of Tampa, 111 So. 119, 120 (Fla. 1926). In subsequent cases, Florida courts have repeatedly emphasized that the purpose of the provision is "to protect public funds and resources from being exploited in assisting or promoting private ventures when the public would be at most only incidentally benefited." Bannon v. Port of Palm Beach Dist., 246 So. 2d 737, 741 (Fla. 1971); Dade County Bd. of Pub. Instruction v. Mich. Mut. Liab. Co., 174 So. 2d 3, 5 (Fla. 1965) (describing the provision as one "designed to protect public monies").

The Florida Supreme Court has only considered the question of whether the lease of public lands to a private developer—the basic structure of the deal in this case—creates an unconstitutional business relationship on two occasions, both of which were over thirty years ago. In the first case, Bannon, the Port of Palm

Beach District entered into a long-term lease with Peanut Island Properties, Inc. in which "[n]o bonded indebtedness or monetary obligation of any kind attached to the Port District as a result of the lease." 246 So. 2d at 740. The Court upheld the constitutionality of the lease, noting that the Port District's involvement in the transaction was limited solely to that of a "lessor and [did] not involve any responsibility for the financing, promotion or development of the proposed project." Id. at 741. Similarly, in West Palm Beach v. Williams, 291 So. 2d 572 (Fla. 1974), the City of West Palm Beach entered into a lease with West Palm Beach Marina, a private corporation. As in Bannon, the Court upheld the lease, finding that:

> Because the constitution requires that bonds be issued, public funds be spent and the power of eminent domain be exercised for public uses only, any lease agreement which requires that one of the above powers be exercised for a private use would necessarily be void. However, when none of the above powers need be exercised in order to proceed to the complete execution of the lease agreement, municipalities, when holding the legislative authority to do so, can lease public land for private uses.

West Palm, 291 So. 2d at 576 (citing Bannon, 246 So. 2d at 737). In summary, the Court held that "where bonds are not issued, public funds are not spent, and the power of eminent domain is not exercised in furtherance thereof, a municipality can lease public land for private uses in accordance with legislative authority." Id.

9

at 578.

While these two cases form the universe of Florida Supreme Court case law involving the leasing of public land to a private developer, neither case deals with a lease similar to the one here, nor offers much detail as to the specifics of the leases at issue in those cases. Here, there is a question as to whether the JAA has incurred a "monetary obligation" as the Agreement between the JAA and Majestic obligates the JAA to construct a road and to provide credit for wetlands mitigation. The development plan also calls for the sharing of net revenues. Furthermore, the JAA granted Majestic the option to lease the property for fifteen years at no cost.

## II. QUESTIONS CERTIFIED

Accordingly, we respectfully certify to the Florida Supreme Court the following questions:

1. Is the JAA a "joint owner" prohibited by article VII, section 10 of the Florida Constitution by virtue of its obligations under the Agreement?

2. Is the JAA impermissibly pledging its "credit" under article VII, section 10 of the Florida Constitution by virtue of its obligations under the Agreement?

Our statement of the certified questions is merely suggestive and is not meant to limit the scope of inquiry of the Florida Supreme Court as it has discretion to examine this issue and other relevant issues. As we have previously

10

stated:

> [T]he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are given, whether as a comprehensive whole or in subordinate or even contingent parts.

Miller v. Scottsdale Ins. Co., 410 F.3d 678, 682 (11th Cir. 2005) (citing Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 284 F.3d 1228, 1234 (11th Cir. 2002) (quoting Martinez v. Rodriguez, 394 F.2d 156, 159 n.6 (5th Cir. 1968))) (alteration in original). Additionally, an answer to one of the questions may make resolution of the other one unnecessary. Macola v. Gov't Employees Ins. Co., 410 F.3d 1359, 1365 (11th Cir. 2005). In order to assist the court in considering the case, the entire record, along with the briefs of the parties, are transmitted herewith.

**QUESTIONS CERTIFIED**.