PER CURIAM.
 

 This case is before the Court for review of two questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit that are determinative of a cause pending in that court and for which there appears to be no controlling precedent. We have jurisdiction.
 
 See
 
 art. Y, § 8(b)(6), Fla. Const. In this ease, the two certified questions ask us to decide whether, under the undisputed facts of the case, the Jacksonville Aviation Authority (“JAA”) has become a joint owner with a private entity in violation of article VII, section 10 of the Florida Constitution and whether it has given, lent, or used its credit to aid a private entity in violation of article VII, section 10 of the Florida Constitution. For the reasons that follow, we hold that the JAA has neither become a joint owner with a private entity by virtue of its obligations under the challenged agreement nor has it given, lent, or used its credit to aid a private entity by virtue of its obligations under the challenged agreement.
 
 [1]
 

 FACTS AND PROCEDURAL HISTORY
 

 Through a suit in federal district court, Jackson-Shaw Company (“Jackson-Shaw”) challenged an agreement between the JAA and Majestic Realty Company (“Majestic”) for Majestic’s long-term use of 828 acres of vacant land owned by the JAA near the Jacksonville International
 
 *1079
 
 Airport.
 
 Jackson-Shaw Co. v. Jacksonville Aviation Auth. (Jackson-Shaw I),
 
 510 F.Supp.2d 691, 695 (M.D.Fla.2007).
 
 [2]
 
 Jackson-Shaw is a private commercial development company that owns a parcel of land known as the Jacksonville International Tradeport near the Jacksonville International Airport.
 
 Id.
 
 at 696. Majestic is also a private commercial development company.
 
 Id.
 
 at 698. As explained in the district court’s opinion, the JAA is a public entity:
 

 The JAA is [a] public body, established by Florida law to develop and administer public airports in Jacksonville, Florida. It is a political subdivision of the state of Florida and it has responsibility for the planning, management and oversite of four airports located in Duval County, including the Jacksonville International Airport (“JIA”) and three smaller air fields, as well as management of a considerable portfolio of undeveloped land. The JAA derives its power and authority from its Charter, which is a special act of the Legislature. The JAA was created to “operate, manage, and control all publically owned airports and ancillary facilities located within Duval County” as provided by statute. The JAA is governed by a seven-member board of directors, four appointed by the governor of Florida, and three appointed by the mayor of Jacksonville. The JAA possesses no independent taxing authority, and receives its revenues from state and federal grants, landing fees, rentals, concession fees and facility lease fees.
 

 The JAA has approximately 4,000 to 6,000 acres of land in its portfolio available for development, depending upon possible future runway configurations. Much of the land available is located in the vicinity of JIA including 328-acre Woodwings East, and its sister parcel of vacant land, 890-acre Woodwings West across International Airport Boulevard, though some is predominantly wetlands. In 2004, the JAA created the Enterprise Division to focus on maximizing the value of the Authority’s undeveloped property, and to diversify the JAA’s revenue sources.... The Enterprise Division is comprised of the real estate division and the consultative services division. The real estate division is responsible for leasing non-aeronautical land at JAA’s four airports to enable non-aeronautical development and generate revenue to the Authority.
 

 Id.
 
 at 697 (citations and footnotes omitted) (quoting ch. 2004-464, § 1, Laws of Fla.).
 

 The challenged agreement between the JAA and Majestic concerns the property known as Woodwings East, which is owned by the JAA and consists of approximately 328 unimproved acres of land lying southeast of Jacksonville International Airport.
 
 Id.
 
 at 698. A portion of Woodwings East was acquired by eminent domain.
 
 Id.
 
 It is part of the Jacksonville International Airport Development of Regional Impact and was tax-exempt at the time of trial.
 
 Id.
 
 The JAA attempted in the past to develop this land into an industrial and office park, but negotiations with another large-scale developer broke down in the late 1990s.
 
 Id.
 
 Thereafter, the JAA retained a consulting firm to determine the highest and best use of the property, and the firm concluded that it should be developed for light industrial and commercial use.
 
 Id.
 
 at 698-99. The JAA never had the property’s value appraised, but it estimated the value based on the price of a nearby parcel of undeveloped property for which it had negotiated to purchase.
 
 Id.
 
 at 699. Based on this transaction, the JAA estimated in
 
 *1080
 
 2005 that Woodwings East was worth between $85,000 and $50,000 an acre, or approximately $10 million.
 
 Id.
 

 In 2003, the JAA “conducted a Non-Aviation Real Estate Development Board Workshop to discuss strategies for putting some of the [JAA’s] real estate assets into production, including whether JAA should get directly involved in the development business, constructing infrastructure, and actually constructing buildings for lease.”
 
 Id.
 
 The JAA’s intent was to derive revenue for the airport.
 
 Id.
 
 at 700. Based on this workshop, the JAA determined that it would ground lease the property, rather than use the JAA’s capital dollars to develop it.
 
 Id.
 
 The JAA placed “For Lease” signs on the property and issued a brochure advertising that it was looking for commercial and industrial development for Woodwings.
 
 Id.
 
 In looking for someone for the property, the JAA wanted to make sure that it did not have to put out any more funds than the $750,000 that it had previously committed in its 2005 capital budget to construct a road extension.
 
 Id.
 
 The JAA did not want to be responsible for providing other infrastructure for the property, which would necessitate the JAA borrowing money impacting its debt ratios.
 
 Id.
 
 at 701. Furthermore, the JAA was seeking a long-term revenue stream.
 
 Id.
 

 In February 2005, Majestic first contacted the JAA after seeing one of the “For Lease” signs.
 
 Id.
 
 In March 2005, Majestic sent the JAA “ ‘a preliminary overview of the real estate and partnership structure’ ” it would propose creating.
 
 Id.
 
 In the ensuing months, the parties negotiated the terms of a two-part transaction: an Option to Ground Lease (“Option”) between the JAA and Majestic, and an incorporated Participating Ground Lease Agreement (“PGL”).
 
 Id.
 
 at 701-02.
 

 “On December 19, 2005, the Option and incorporated PGL were presented to the JAA board of directors for the first time in a public meeting.”
 
 Id.
 
 at 704. The Submission for Board Approval provided in pertinent part:
 

 Pursuant to its charge of diversifying the Jacksonville Aviation Authority’s (“JAA”) non-aviation revenue stream through the development of non-aeronautical real estate at JAA airports, the Enterprise Division identified and concentrated its efforts on the unimproved JAA real estate known as Woodwings East.
 

 [[Image here]]
 

 The proposed arrangement provides JAA with a vehicle to generate significant cash flow for vacant non-producing land with a large industry leader with a successful track record of performing as promised and generating significant cash flow for landowners.
 

 Id.
 
 The JAA board unanimously approved the Option and PGL and authorized its executive director, John Clark, to enter into and execute all necessary agreements.
 
 Id.
 
 at 705. The board chairman, Mary Burnett, testified that she voted for the project because “ T thought in the best interest of the Jacksonville International Airport this was the right thing to do.... This was a good use for the property ... [I]t’s been vacant for many years. It was going to generate revenue. It was going to
 
 give
 
 people jobs. It was a good thing for the community.’ ”
 
 Id.
 

 After the board’s approval in December 2005, negotiations between the JAA and Majestic continued, and among other terms, a fixed rent was added on the advice of the JAA’s counsel.
 
 Id.
 
 at 706. On September 18, 2006, the JAA board
 
 of
 
 directors, in a public board meeting, approved the revised Option and PGL.
 
 Id.
 
 The 2006 board submission mirrored that provided to the board in 2005 with several amendments.
 
 Id.
 
 The Option was signed by Majestic, and Clark signed the Option
 
 *1081
 
 the day before trial commenced in this case.
 
 Id.
 
 at 707.
 

 The district court’s opinion summarized the pertinent aspects of the Option and PGL as follows:
 

 1.
 
 Summary
 

 The JAA approved a two-part agreement with Majestic, granting Majestic an option to designate and lease sub-parcels for commercial development from the 328-acre Woodwings East parcel for a period of five years, with the right to extend the Option up to 15 years. The Option encumbers the entire 328 acre tract, and is at no cost to Majestic. After exercising the Option on a sub-parcel by the end of the 5-year Option period, Majestic has up to four more years to prepare to lease it, all without a return to the JAA. The 65-year ground lease (PGL) which is incorporated into the Option, to be executed by the JAA and Majestic for each sub-parcel, provides Majestic an additional four years to “substantially complete” commercial development on the property. After a one-year grace period from the closing on each PGL, Majestic would pay JAA either a “fixed rent” of $1,380 per acre per year on the leased sub-parcel,
 
 or
 
 50 percent of the “net revenue” generated by Majestic’s sub-leases of the commercial development (“revenue rent”), whichever is greater. “Net revenue” is determined after Majestic is reimbursed from gross revenue for all pre-development costs, management fees, construction costs (to an affiliate of Majestic), design, maintenance, financing, infrastructure and other costs and “advances”, with interest, and all “fixed rent” paid. Thus, at the point when JAA and Majestic each start receiving “revenue rent,” Majestic will have been reimbursed for all costs and money spent, and will have already realized market-rate profit from recoupment of fees and costs, and thus will be virtually out-of-pocket nothing. The JAA is obligated to construct a $750,000 road extension into the Woodwings East parcel, and to provide up to 50 acres of wetlands mitigation land, if necessary. These expenses are not reimbursed to the JAA.
 

 Relevant specifics of the documents are as follows.
 

 2.
 
 Option to Ground Lease Agreement (Ex. 2U.)
 

 The Option encumbers the entire 328 acre Woodwings East parcel, at no cost to Majestic, and gives Majestic the five-year right until October 5, 2011, to begin leasing parcels within Woodwings East (a procedure called “taking down” of parcels) by entering into a PGL, incorporated into the Option, on the parcel that it designates from the project’s master plan. If Majestic builds 100,000 square feet of building area on the designated parcel to “substantial completion,” the Option agreement is extended for an additional year. By continuing to “substantially complete” building area, Majestic can extend the Option up to a maximum of 15 years, including the initial five. In practice, if Majestic builds 100,000 square feet of building per year for ten years, it would have used fifteen years and would have constructed a million square feet. A separate PGL is contemplated for each development parcel with a project development plan.
 

 Majestic is not obligated under the Option to enter into a PGL until the Authority approves the project development plan for the designated parcel,
 
 and
 
 Majestic completes several “performance benchmarks.” The performance benchmarks provide the timetable for Majestic’s performance in preparing a parcel for construction, including obtain
 
 *1082
 
 ing a wetlands survey, applying for wetlands permits, submission of a project development plan to the City of Jacksonville for review, and applying for a building permit. If Majestic fails to comply with the performance benchmarks, the JAA’s sole and exclusive remedy is to terminate the Option as to the particular parcel. The initial five-year Option term, and Majestic’s obligations under the performance benchmarks, are further tolled while this lawsuit is pending through trial and appeal, though notwithstanding the tolling period, the option term may not exceed 15 years from the date of the Agreement.
 

 Jackson-Shaw expert C. Allen Watts testified without contradiction that these benchmarks, if all exercised to the maximum amount of time allowable, conceivably could delay the closing on a PGL, and thus the recovery by the JAA of any rent, for the development parcel for an additional four years or a total of nine years from the exercise of the Option (plus an additional one-year grace period provided by the incorporated PGL agreement, for a total of 10 years out), all without Majestic breaching or forfeiting the Option. If, after the nine years, Majestic fads to close on the PGL, it withdraws the exercise of the Option as to that development parcel, and may walk away from the deal, without liability for breach or damages to the Authority. The benchmark timetable was not provided to the Board in December 2005, but was in the September 2006 draft of the Option approved by the Board.
 

 The JAA’s obligations under the Option include constructing the currently planned and budgeted north-south extension of Alvarez Road through the Woodwings East parcel at a cost “not to exceed” $750,000. [n. 15] Further, the JAA agreed to provide, at no cost to Majestic, up to 50 acres of wetlands mitigation that may be required by Majestic’s development of Woodwings East (in addition to wetlands mitigation required for the Alvarez Road extension). Any additional wetlands mitigation required by Majestic will be treated as an “advance” and reimbursed to Majestic out of gross revenues.
 

 [N. 15.] The first phase of Majestic’s development, involving the construction of three buildings, requires JAA to extend Alvarez Road, a public road, into the interior of the Woodwings East parcel.
 

 “Advances” means costs incurred by Majestic, including all “pre-development costs,” approved infrastructure costs; and other enumerated costs incurred in modification of the PUD; relocation of an electric utility easement; signs; obtaining required government approvals and permits for development; land platting; and wetlands mitigation expenses.
 

 If the Option is terminated or expires (other than because of breach by the Authority) Majestic may recoup all un-reimbursed pre-development costs and approved infrastructure costs through the then-existing PGLs. If JAA materially breaches the Option or any PGLs, then JAA must reimburse all outstanding pre-development and infrastructure costs paid by Majestic.
 

 Each project development budget will include a 4% Development Fee to be paid to Majestic. All costs incurred by the JAA to comply with its obligations under the Option, however, shall not be treated or reimbursed to JAA as an “advance.”
 

 JAA agreed in the Option that Majestic can use its affiliate, Commerce Construction Co., for construction of the commercial buildings on the designated development parcels.
 

 
 *1083
 
 3.
 
 Participating Ground Lease (Ex. 21U-)
 

 The terms of the 65-year PGL, which is incorporated as Exhibit “C” to the Option, describe the rent and revenue structure of the transaction between JAA and Majestic.
 

 “Rent” is the greater of 1) $1,380 per acre per year per year, subject to periodic increases based upon the Consumer Price Index, (“Fixed Rent”) or 2) 50 percent of the net revenue during each whole or partial calendar year (“revenue rent”). “Net revenue” is defined as cash remaining after deduction from total revenue of Majestic’s 1) debt service; 2) project costs
 
 (all
 
 costs incurred and paid by Majestic in designing, development, financing, constructing, owning, operating, maintaining, leasing and managing the premises and commercial facilities); 3) a “reasonable reserve” for future project costs or as required by any lender to Majestic; and 4) repayment of advances [n. 16] with interest set at 250 points over prime.
 

 [N. 16.] The term “equity contribution” was used in the December 19, 2005 and September 6, 2006 submissions for Board approval, The term “advances” was later substituted.
 

 Rent does not commence until one month past the first anniversary following the effective date of the PGL. Thus, once Majestic enters into a PGL with the Authority, it receives one year rent-free. Further,
 

 Once Revenue Rent is payable to [JAA] by [Majestic], the amount of all Fixed Rent previously paid by [Majestic] at any time during the Term of this Agreement shall be credited, dollar for dollar, against the Revenue Rent otherwise payable by [Majestic], thereby reducing the amount of Revenue Rent actually payable, provided the total Rent paid to [JAA] by [Majestic] shall not be less than the Fixed Rent payable under this Lease. Such crediting of previously paid Fixed Rent shall continue throughout the Term of this Agreement.
 

 As in the Option, “development fees,” which are reimbursed to Majestic from gross revenues prior to determination of “net revenue,” means the fee paid to Majestic in the amount of four percent of the construction and improvement costs in the development budget. “Management fees” paid to Majestic for the administration of the commercial facilities in Woodwings East range from three to five percent of the total revenue received by Majestic from sublessees.
 

 The PGL requires construction to commence on the development parcel within two years of the execution of the PGL, and for construction to be substantially complete two years later, otherwise, Majestic will be in breach of the PGL. Thus, if Majestic uses all time provided under the PGL, revenues from sublessees may not be generated for four years or more after a PGL is signed.
 

 While the PGL contemplates no in-cumbrance or liens on JAA’s fee simple title to the land, [n. 17] loans to Majestic in connection with its development of commercial facilities and improvements on the land “may be secured by a mortgage or deed of trust encumbering the leasehold estate” created by the PGL. If the leasehold interest is foreclosed upon by a Majestic lender, revenue rent may be abated. Thus, Majestic’s lenders may foreclose on its leasehold interest, and the foreclosing lenders will step into Majestic’s shoes, assuming a preferred position, with its debt being repaid prior to maintenance expenses, and prior to the determination of net revenue to be shared with the Authority.
 

 
 *1084
 
 [N. 17.] The cost to Majestic of bonding against or discharging a lien on the fee is treated as a “project cost” and reimbursed out of gross revenues before the split distribution of net revenues, or “revenue rent” to the Authority.
 

 All improvements and buildings constructed on the premises by Majestic are owned by Majestic until the expiration or termination of the PGL. At termination of the PGL, Majestic will leave the premises and title and ownership in the buildings and other improvements to the property will pass to JAA.
 

 If Majestic defaults on the PGL by failing to pay rent, or abandoning the premises or failing to fulfill other terms and conditions set forth in the agreement, JAA may pursue all rights in law and equity. Any money judgment in favor of JAA resulting from default by Majestic “shall not exceed an amount equal to the fair market value of [Majestic’s] interest in the Premises,” subject to several exceptions, including when Majestic “intentionally commits waste on the Premises.”
 

 Id.
 
 at 707-11 (citations and footnote omitted).
 

 In its suit for declaratory and injunctive relief, Jackson-Shaw contested the lawfulness of this agreement on several grounds.
 
 Id.
 
 at 695-96.
 
 [3]
 
 Among other arguments, Jackson-Shaw contended that the transaction violated the prohibition in article VII, section 10 of the Florida Constitution, against a government entity becoming a joint owner with, or giving, lending, or using its credit to aid, a corporation.
 
 Id.
 
 at 695. After a bench trial, the district court entered judgment in favor of the JAA.
 
 Id.
 
 at 696, 739. The district court determined that the agreement did not violate the prohibition against joint ownership because the relationship between the JAA and Majestic was not a joint venture as defined under Florida law.
 
 Id.
 
 at 727-31. The district court also determined that the JAA was not pledging its credit through the transaction and that the transaction served a public purpose.
 
 Id.
 
 at 731-35.
 

 On appeal to the Eleventh Circuit, Jackson-Shaw again raised the claims that the agreement violated article VII, section 10 of the Florida Constitution.
 
 Jackson-Shaw Co. v. Jacksonville Aviation Auth. (Jackson-Shaw II),
 
 508 F.3d 653, 654 (11th Cir.2007). The Eleventh Circuit determined that resolution of the issues depended on unsettled state law and noted that this Court had only considered the question of whether the lease of public lands to a private developer was unconstitutional in two prior cases, neither of which dealt with a lease similar to the one in this case.
 
 Id.
 
 at 654, 657-58. Accordingly, the Eleventh Circuit certified the following questions to this Court:
 

 1. Is the JAA a “joint owner” prohibited by article VII, section 10 of the Florida Constitution by virtue of its obligations under the Agreement?
 

 2. Is the JAA impermissibly pledging its “credit” under article VII, section 10 of the Florida Constitution by virtue of its obligations under the Agreement?
 

 Id.
 
 at 658.
 

 ANALYSIS
 

 The parties agree that the certified questions arise from undisputed facts. These questions also require this Court to interpret the Florida Constitution. The
 
 *1085
 
 interpretation of the Florida Constitution is a question of law.
 
 See Crist v. Fla. Ass’n of Criminal Def. Lawyers, Inc.,
 
 978 So.2d 134, 139 (Fla.2008). Because the certified questions involve pure questions of law that arise from undisputed facts, they are subject to de novo review.
 
 Macola v. Gov’t Employees Ins. Co.,
 
 953 So.2d 451, 454 (Fla.2006).
 

 First, we set out the relevant constitutional provision and its history. Then we discuss similar cases interpreting this provision and the provision which immediately preceded it. Next, we address whether the JAA has become a joint owner with Majestic. Finally, we address whether the JAA has given, lent, or used its credit to aid Majestic.
 

 Article VII, Section 10 of the Florida Constitution
 

 Article VII, section 10 of the Florida Constitution, which is entitled “Pledging credit,” provides in pertinent part:
 

 Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person....
 

 Art. VII, § 10, Fla. Const. (1968).
 
 [4]
 

 Article IX, section 10 of the 1885 Florida Constitution preceded Florida’s current prohibition. This predecessor provision provided:
 

 The credit of the State shall not be pledged or loaned to any individual, company, corporation or association; nor shall the State become a joint owner or stockholder in any company, association or corporation. The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stock holder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual.
 

 Art. IX, § 10, Fla. Const. (1885).
 

 Before the predecessor provision was adopted, the Florida Constitution contained a prohibition against the State using public money for private business; however, the Florida Constitution did not prohibit the Legislature from authorizing local governments to provide public money to private business. Joseph W. Little,
 
 The Historical Development of Constitutional Restraints on the Power of Florida Governmental Bodies to Borrow Money,
 
 20 Stetson L.Rev. 647, 655-57 (1991);
 
 see also
 
 art. XIII, § 10, Fla. Const. (1865) (“The General Assembly shall not pledge the faith and credit of the State to raise funds in the aid of any corporation whatever.”); art. XIII, § 10, Fla. Const. (1861) (same); art. XIII, § 13, Fla. Const. (1838) (same). Without a prohibition against local government financing private business, public financing of private business became commonplace.
 
 Little, supra,
 
 at 656. For example, local governments underwrote railroad expansions by subscribing to stock in railroad companies.
 
 Id.; see also Brautigam v. White,
 
 64 So.2d 781, 784 (Fla.1953).
 

 As explained by this Court in
 
 Bailey v. City of Tampa,
 
 92 Fla. 1030, 111 So. 119 (1926), the prevalence of public financing of private business resulted in the adoption of the prohibition contained in the 1885 Florida Constitution:
 

 Section 10 of article 9 of our organic law was first adopted in 1875 as an amendment to section 7 of article 13 of the Constitution of 1868. The reason for this amendment was that, during the years immediately preceding its adoption, the state and many of its counties,
 
 *1086
 
 cities, and towns had by legislative enactment become stockholders or bondholders in, and had in other ways loaned their credit to, and had become interests ed in the organization and operation of, railroads, banks, and other commercial institutions. Many of these institutions were poorly managed, and either failed or became heavily involved, and, as a result, the state, counties, and cities interested in them became responsible for their debts and other obligations. These obligations fell ultimately on the taxpayers. Hence the amendment, the essence of which was to restrict the activities and functions of the state, county, and municipality to that of government, and forbid their engaging directly or indirectly in commercial enterprises for profit.
 

 Id.
 
 at 120. Thus, as the language of the provision reflected, its purpose was to prohibit state and local governments from becoming stockholders in or loaning their credit to any corporation, association, institution, or individual and to “counter debauching the State’s credit and the reckless speculation resulting therefrom.”
 
 Brautigam,
 
 64 So.2d at 784. The provision was designed “to protect public monies” and “to keep the State out of private business; to insulate State funds against loans to individual corporations or associations and to withhold the State’s credit from entanglement in private enterprise.”
 
 Dade County, Bd. of Pub. Instruction v. Mich. Mut. Liab. Co.,
 
 174 So.2d 8, 5-6 (Fla.1965).
 

 Although the 1968 Florida Constitution added limiting constructions and exceptions to the broad prohibition contained in the 1885 Florida Constitution,
 
 [5]
 
 the general language in the prohibition against public entities becoming joint owners with or pledging their credit to private entities was not substantially altered. Thus, like the 1885 provision before it, the 1968 prohibition “acts to protect public funds and resources from being exploited in assisting or promoting private ventures when the public would be at most only incidentally benefitted.”
 
 Bannon v. Port of Palm Beach Dist.,
 
 246 So.2d 737, 741 (Fla.1971).
 

 Prior Cases
 

 The four cases where the challenged arrangements most closely resemble the agreement in this case are cases in which the challenged arrangement was a lease or temporary conveyance of land from a public entity to a private entity without the issuance of bonds.
 

 First, in
 
 Bailey,
 
 this Court addressed whether a contract between the City of Tampa and the Tampa Board of Trade violated the constitutional prohibition in article IX, section 10 of the 1885 Florida Constitution. Ill So. at 119. In the challenged contract, the city agreed to convey a parcel of land to the board.
 
 Id.
 
 The board agreed to erect a building on the land within three years of entering into the contract.
 
 Id.
 
 The building’s plan had to be approved by the city, and if the building was not constructed within three years, the board had to reconvey the property to the city upon demand.
 
 Id.
 
 The board agreed to pay the entire expense and cost of the building, a portion of which was to be turned over for the city’s use at the
 
 *1087
 
 time of completion.
 
 Id.
 
 at 119-20. Furthermore, the board agreed to reconvey the land and improvements to the city within thirty-five years, free from any lien or indebtedness, upon the retiring of bonds, notes, or mortgages.
 
 Id.
 
 at 119. The board would retain the right to use the land and improvements as was necessary to carry out its purpose and consistent with the public interest.
 
 Id.
 
 This Court determined that this contract did not violate the constitutional prohibition, reasoning that the contract “reveals no authorization on the part of the city of Tampa to become a stockholder in the Tampa board of trade, or to obtain or appropriate money for it, or to loan it or any other corporation, association, institution, or individual its credit.”
 
 Id.
 
 at 120. We explained that whether the contract was wise as a matter of policy was in the discretion of the city’s officers and electors to determine.
 
 Id.
 

 Second, in
 
 Raney v. City of Lakeland,
 
 88 So.2d 148 (Fla.1956), this Court addressed whether a ninety-nine-year lease of publicly-owned land by a municipality to a nonprofit corporation violated article IX, section 10 of the 1885 Florida Constitution.
 
 Id.
 
 at 149-50. In the challenged arrangement, the City of Lakeland agreed to lease land to the Garden Club of Lakeland, Inc., for an annual rental of $1 and other considerations.
 
 Id.
 
 at 149. The land had been originally purchased by the city some years earlier for off-street parking of motor vehicles, but it had never been used to any extent.
 
 Id.
 
 The lease provided that the club could not use the land for private gain and that the club would establish and maintain a public library on horticulture and maintain a service for the dissemination of educational information on horticulture for the benefit of the public.
 
 Id.
 
 The club agreed to construct, at its expense, a building for the library within two years of entering into the lease.
 
 Id.
 
 The lease included clauses protecting the city with public liability insurance, covenants against assignment and subletting, and cancellation upon breach of any covenant.
 
 Id.
 
 The improvements would revert to the city with the land at the end of the lease term.
 
 Id.
 
 The lease also stated that the city did not have a present or anticipated need for the land and that it was executed to permit enlargement of the program and facilities of the club for furtherance of its work in behalf of the general welfare.
 
 Id.
 
 at 150. This Court found that the lease was valid.
 
 Id.
 
 We noted that “the beautification of a modern city by extensive and well-conceived planting of trees, flowers and shrubs is a proper function of municipal government.”
 
 Id.
 
 at 151. This Court also observed that the club was not a private corporation for profit and that “[i]f it were, [the] lease could not stand.”
 
 Id.
 
 We further noted that as in
 
 Bailey,
 
 the lease at issue imposed no obligation on the city.
 
 Id.
 
 We ultimately determined that the lease served a useful public purpose at no profit to the club.
 
 Id.
 
 at 152.
 

 Third, in
 
 Bannon,
 
 this Court addressed whether a long-term lease and development plan between the Port of Palm Beach District and Peanut Island Properties, Inc., violated, among other provisions, article VII, section 10 of the 1968 Florida Constitution. 246 So.2d at 738. The land at issue was an artificial island, purchased by the port district decades earlier, which had been used primarily as an undeveloped recreation facility, a public landing, and anchorage.
 
 Id.
 
 at 738-39. Although this Court did not discuss the details of the agreement, we framed the question presented as
 

 whether or not the leasing of the property to a private concern for development at private expense violates the constitutional and statutory prohibition against the lending of the credit of the State for a private purpose, or whether or not the
 
 *1088
 
 overall plan is prohibited by the organic law of the State.
 

 Id.
 
 at 740. This Court noted that it was not faced with a financing scheme involving the issuance of revenue bonds or another form of public financing for the construction of a facility for a private concern’s exclusive use and that “[n]o bonded indebtedness or monetary obligation of any kind attached to the Port District as a result of the lease.”
 
 Id.
 
 We also observed that through the lease agreement, the district “did not become a joint owner or stockholder of the private tenant, nor did it lend, obligate or in any manner encumber its credit to the advantage of the tenant.”
 
 Id.
 
 at 740-41. This Court explained, “The District’s participation in the transaction is limited to that of a lessor and does not involve any responsibility for the financing, promotion or development of the proposed project.”
 
 Id.
 
 at 741. We held that neither the spirit nor the letter of the constitutional prohibition was violated, observing that “the District has no financial responsibility and if all failed for the corporate tenant, the District would not bear any responsibility or obligation to the creditors nor would its ownership of the land be committed for such” and that “[the District’s] interest and credit remain free from attachment.”
 
 Id.
 
 This Court also explained that it did not find it necessary to determine whether the development of the leased property served a primarily public or private purpose.
 
 Id.
 
 at 740. We noted that the district was exercising a power conferred to it by the Port Facilities Financing Law (chapter 315, Florida Statutes), which provided in pertinent part that the powers conferred by it and the exercise of those powers were proper public and municipal purposes.
 
 Id.
 
 (citing § 315.14, Fla. Stat.).
 

 Fourth, in
 
 City of West Palm Beach v. Williams,
 
 291 So.2d 572 (Fla.1974), this Court addressed whether a lease between the City of West Palm Beach and West Palm Beach Marina, Inc., a private corporation, violated article VII, section 10 of the 1968 Florida Constitution.
 
 Id.
 
 at 574-76. The agreement concerned property owned by the city which had been used in a proprietary capacity and consisted of a marina, gasoline service station, restaurant, and metered parking lot.
 
 Id.
 
 at 574. Although we did not describe the details of the lease agreement, we framed the issue presented as “whether municipalities can lease public lands for private uses when the lease is not coupled with the issuance of bonds or with the acquisition of land by purchase or eminent domain.”
 
 Id.
 
 at 576. This Court explained the principles governing the resolution of the issue:
 

 Because the constitution requires that bonds be issued, public funds be spent and the power of eminent domain be exercised for public uses only, any lease agreement which requires that one of the above powers be exercised for a private use would necessarily be void. However, when none of the above powers need be exercised in order to proceed to the complete execution of the lease agreement, municipalities, when holding the legislative authority to do so, can lease public land for private uses.
 

 Id.
 
 (citing
 
 Bannon,
 
 246 So.2d 737). We found that the city had both the general statutory authority and specific authority in its charter to lease the property.
 
 Id.
 
 at 577. This Court also noted that through the statutes providing general legislative authority to municipalities, the Legislature had determined that the lease of public lands for private purposes was a valid public purpose.
 
 Id.
 
 at 578. We further opined, “In fact, it would be beneficial in many instances to lease surplus public property for non-public purposes so that the citizens and taxpayers would realize some tax relief resulting from the income.”
 
 Id.
 
 This Court ultimately found the lease
 
 *1089
 
 agreement to be lawful and concluded that “where bonds are not issued, public funds are not spent, and the power of eminent domain is not exercised in furtherance thereof, a municipality can lease public land for private uses in accordance with legislative authority.”
 
 Id.
 

 In sum, in prior cases we have analyzed whether a lease or temporary conveyance of land from a public entity to a private entity violates article VII, section 10 of the 1968 Florida Constitution and the provision that immediately preceded it, article IX, section 10 of the 1885 Florida Constitution. However, as discussed below, in prior cases we did not determine the constitutionality of an agreement quite like the one challenged in this case.
 

 Joint Ownership
 

 The first question certified by the Eleventh Circuit asks whether the JAA is a joint owner with Majestic, thereby violating article VII, section 10 of the Florida Constitution.
 
 Jackson-Shaw II,
 
 508 F.3d at 658. Jackson-Shaw contends that the agreement violates the prohibition against joint ownership because it requires a public body to invest public resources in a private development in exchange for revenue that depends largely on the financial success of the private company managing the development. Although Jackson-Shaw rejects the district court’s reliance on the common law test for joint ventures, Jackson-Shaw also argues that to the extent the elements of a joint venture are relevant to the constitutional prohibition on joint ownership, those elements are met. In contrast, the JAA suggests that the common legal principles of partnerships and joint ventures are relevant to the definition of joint ownership and that the JAA is neither a partner nor a joint venturer under the agreement.
 

 The district court determined that the agreement in the instant case did not violate the constitutional prohibition against joint ownership by ascertaining that it did not create a joint venture.
 
 Jackson-Shaw I,
 
 510 F.Supp.2d at 727-31. A joint venture is a legal relationship similar to a partnership but more limited in scope.
 
 See Kislak v. Kreedian,
 
 95 So.2d 510, 514-15 (Fla.1957). A joint venture “is created when two or more persons combine their property or time or a combination thereof in conducting some particular line of trade or for some particular business deal.”
 
 Id.
 
 at 515. This relationship must arise out of a contract.
 
 Id.
 
 In order to create a joint venture, a contract must contain the following elements: “(1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained.” M
 
 [6]
 
 The absence of one of the elements precludes a finding of a joint venture.
 
 USA Independence Mobilehome Sales, Inc. v. City of Lake City,
 
 908 So.2d 1151, 1158 (Fla. 1st DCA 2005) (citing
 
 Austin v. Duval County Sch. Bd.,
 
 657 So.2d 945, 948 (Fla. 1st DCA 1995)). Moreover, in a joint venture, the parties have the right and authority to bind the others with reference to the subject matter of the joint venture.
 
 Kislak,
 
 95 So.2d at 516.
 

 The district court also discussed some partnership principles in determining whether the agreement established a joint venture.
 
 Jackson-Shaw I,
 
 510 F.Supp.2d
 
 *1090
 
 at 727-31. Under Florida’s Revised Uniform Partnership Act, “the association of two or more persons to carry on as coown-ers a business for profit forms a partnership, whether or not the persons intend to form a partnership.” § 620.8202(1), Fla. Stat. (2006). Furthermore, a person who receives a share of the business’s profits is presumed to be a partner, unless the profits were received in payment of rent, among other things. § 620.8202(3)(c)S., Fla. Stat. (2006).
 

 In analyzing the agreement in the instant case in light of principles of joint ventures and partnerships, the district court rejected Jackson-Shaw’s contention presented during oral argument that the term joint owner has a broader meaning than the terms joint venturer or partner.
 
 Jackson-Shaw I,
 
 610 F.Supp.2d at 731 n. 38. The district court noted that the few Florida sources discussing the joint ownership prohibition likened the term to joint venture or partnership.
 
 Id.
 
 These sources are primarily opinions from the Florida Attorney General.
 
 See id.
 
 In one of the cited opinions, the Attorney General noted that the term joint ownership was not defined for the purpose of the constitutional prohibition. Op. Att’y Gen. Fla. 93-44 (1993). The Attorney General then defined the terms ownership and partnership and determined whether the questioned transaction met those definitions.
 
 See id.
 
 The Attorney General also noted that the person seeking the advisory opinion raised the issue of whether the arrangement constituted a “ ‘joint venture’ which would be constitutionally prohibited.”
 
 Id.
 
 Applying the five elements of a joint venture, the Attorney General determined that it did not.
 
 Id.
 
 In another of the cited opinions, the Attorney General was asked by the person seeking the advisory opinion whether a city could “enter into a partnership with a private corporation for the delivery of natural gas service to the city’s residents.” Op. Att’y Gen. Fla. 2002-07 (2002). The opinion noted that a corporation proposed a partnership whereby the city would share in the net revenues.
 
 Id.
 
 Without particularly describing why the proposal violated the constitutional prohibition, the Attorney General advised that the city could not enter into the partnership.
 
 Id.
 

 While the district court determined that the agreement did not violate the constitutional prohibition against joint ownership by finding that it did not establish a joint venture or partnership and several opinions of the Attorney General have also demonstrated similar approaches to such questions, we do not agree that the term joint owner necessarily equates to the term joint venturer or the term partner.
 
 [7]
 

 A court’s task in constitutional interpretation follows principles similar to the principles of statutory interpretation.
 
 Zingale v. Powell,
 
 885 So.2d 277, 282 (Fla.2004) (citing
 
 Coastal Fla. Police Benevolence Ass’n v. Williams,
 
 838 So.2d 543, 548 (Fla.2003)). We have previously explained some of these principles as follows:
 

 We agree with the petitioners that “[a]ny inquiry into the proper interpretation of a constitutional provision must
 
 *1091
 
 begin with an examination of that provision’s explicit language.”
 
 Florida Society of Ophthalmology v. Florida Optometric Assn.,
 
 489 So.2d 1118, 1119 (Fla.1986). Likewise, this Court endeavors to construe a constitutional provision consistent with the intent of the framers and the voters.
 

 Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm’n,
 
 838 So.2d 492, 501 (Fla.2003).
 

 By necessarily equating the term joint owner with the term joint venturer or the term partner, a court may ignore the provision’s explicit language. The language of the constitutional prohibition provides that “[njeither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of ... any corporation, association, partnership or person.” Art. VII, § 10, Fla. Const. (1968). The language does not explicitly prohibit joint ventures or partnerships.
 

 Furthermore, by necessarily equating the term joint owner with the term joint venturer or the term partner, a court may fail to examine whether those terms provide a meaning consistent with the intent of the framers. As discussed above, the 1885 prohibition against joint ownership was enacted in response to the State and local governments loaning their credit to and becoming interested in the organization and operation of commercial institutions that later failed and for which the government bodies became responsible for their debts and obligations.
 
 See Bailey,
 
 111 So. at 120. It was designed to protect public funds.
 
 See Mich. Mut. Liab. Co.,
 
 174 So.2d at 5-6. Like the 1885 prohibition, the 1968 prohibition was also designed to protect public funds.
 
 See Bannon,
 
 246 So.2d at 741. Because an arrangement may fail the test for a joint venture if even one of the elements is not met, equating the term joint owner to joint venturer may fail to recognize joint ownership arrangements that jeopardize public funds but do not strictly meet the test for a joint venture.
 

 In addition, although we have not explicitly defined the term joint owner in prior cases, in those cases in which we have directly addressed the prohibition against a public entity becoming a joint owner with, or stockholder of, a private entity we have been concerned with the nature of the relationship that would arise through a proposed arrangement.
 
 See Mich. Mut. Liab. Co.,
 
 174 So.2d at 4-6 (evaluating the nature of the proposed relationship and looking to the character of the insurer and the terms of a proposed contract of insurance between the Board of Public Instruction and a mutual insurance company and finding that the proposed agreement did not violate the constitutional prohibition);
 
 State v. Dade County,
 
 142 So.2d 79, 82-83, 88 (Fla.1962) (holding that the sale of common stock of privately owned transportation systems to a county did not violate the constitutional prohibition where the companies in question would be dissolved at the closing of the transaction and the county would then own the transportation systems and all their physical properties);
 
 Brautigam,
 
 64 So.2d at 782, 784 (finding that a transaction by which a county would acquire title to lands owned by a private club by entering into a purchase agreement with the club’s holders of “participating ownership certificates,” acquiring the property, dissolving the club, and vesting title to the lands in the county did not violate the constitutional prohibition);
 
 State v. City of Key West,
 
 153 Fla. 226, 14 So.2d 707, 708-09 (1943) (holding that an ordinance authorizing a city to acquire controlling capital stock of an electric company and the procedure proposed under the ordinance would make the city a stockholder in a corporation in violation of the constitutional prohibition).
 

 
 *1092
 
 Keeping in mind the actual language used in the constitutional prohibition and the purpose of the prohibition as well as the nature of the relationship that will arise under the agreement, the question is whether the agreement between the JAA and Majestic violates the constitutional prohibition against joint ownership.
 

 As this Court’s holdings in
 
 Williams
 
 and
 
 Bannon
 
 reflect, a lease by a public entity to a private entity is not per se invalid under article VII, section 10 of the 1968 Florida Constitution.
 
 See Williams,
 
 291 So.2d at 578;
 
 Bannon,
 
 246 So.2d at 740-41.
 
 [8]
 
 Because such arrangements are not per se invalid, a public entity thus does not become a joint owner with a private entity merely by entering into a lease. However, Jackson-Shaw argues that unlike the public bodies in
 
 Williams
 
 and
 
 Bannon,
 
 the JAA has undertaken financial responsibility and will suffer serious losses.
 
 Cf. Williams,
 
 291 So.2d at 578 (suggesting that public funds were not spent by the municipality in leasing public land to a private corporation);
 
 Bannon,
 
 246 So.2d at 741 (observing that the district’s participation was limited to that of a lessor and did not involve responsibility for the financing, promotion, or development of the proposed project and that the district would bear no responsibility to the corporate tenant’s creditors and its ownership of the land would not be committed for such if the corporate tenant failed).
 

 Jackson-Shaw cites several aspects of the Option and PGL as demonstrating that the JAA has undertaken financial responsibility and will suffer losses. For example, Jackson-Shaw argues that through entering into the Option the JAA is expending public funds on the road extension and wetlands mitigation credit and is encumbering public lands for no consideration. Jackson-Shaw argues that if and when Majestic exercises the Option, Majestic has up to four years to enter into a lease and has the ability to walk away without penalty. Jackson-Shaw also contends that if and when Majestic exercises the Option, the JAA will have to effectively reimburse Majestic for all its costs and pay additional profits to Majestic for developing and managing the property before the JAA gets to share in the revenue under a PGL. Jackson-Shaw contends that if Majestic defaults on its financing under a PGL, lenders are authorized to foreclose on the leasehold interest and recoup all of their collection costs out of the project’s revenue before the JAA gets revenue rent. Jackson-Shaw also notes that if Majestic defaults on a PGL, the JAA’s right to recover damages is limited to the fair market value of Majestic’s interest in the premises.
 

 In determining whether the agreement violates the constitutional prohibition against joint ownership, we first look to whether the JAA has incurred financial obligations as a result of the agreement so as to make it a joint owner with Majestic.
 
 See Williams,
 
 291 So.2d at 578;
 
 Bannon,
 
 246 So.2d at 741. Under the Option, the JAA is obligated to construct a currently planned and budgeted road extension at a cost not to exceed $750,000. Because the road extension had already been planned and budgeted, the JAA is not actually using public funds so as to create a prohibited joint ownership. The Option is merely obligating the JAA to do something it already intended to do. The JAA is also obligated to provide, at no cost to Majestic, up to fifty acres of land for wetlands mitigation that may be required by Majestic’s development of Woodwings East. The Op
 
 *1093
 
 tion explains that the JAA will provide wetlands mitigation by designating land it owns that can be subject to a conservation easement. Even though the JAA already owns any land that will be used for wetlands mitigation, it could be argued that it is using public resources to assist in a private venture.
 
 See Bannon,
 
 246 So.2d at 741. Nevertheless, we do not find that this provision renders the JAA and Majestic joint owners.
 

 In determining whether the agreement violates the constitutional prohibition against joint ownership, we also look to the nature of the relationship that will arise under the agreement.
 
 See Mich. Mut. Liab. Co.,
 
 174 So.2d at 4-5. While Jackson-Shaw cites several other aspects of the Option and PGL as establishing the JAA and Majestic as joint owners, the other aspects are not problematic under our case law. Moreover, Jackson-Shaw never truly explains why certain aspects of the agreement make the JAA a prohibited joint owner with Majestic. For example, if Majestic exercises the Option and closes on a PGL, the JAA will receive rent, which is the greater of $1,380 per acre per year, subject to periodic increases based upon the Consumer Price Index (fixed rent), or fifty percent of the net revenue during the whole or partial calendar year (revenue rent). Because the JAA will receive a fixed rent if the revenue rent is less than the fixed rent, it is immaterial to the joint ownership analysis that Majestic’s costs and fees are reimbursed from gross revenues prior to a determination of net revenue. Moreover, the fact that the JAA may receive rent by receiving fifty percent of the net revenue does not necessarily make the JAA a joint owner with Majestic. The Attorney General’s opinion suggesting that the sharing of net revenues is problematic fails to explain why this fact violates the constitutional prohibition, and moreover, the agreement presented for the advisory opinion may be distinguishable from the instant case because no fixed rent alternative was discussed in the opinion.
 
 See
 
 Op. Att’y Gen. Fla. 2002-07 (2002). Furthermore, with the possible exceptions of the road construction and wetlands mitigation, the JAA does not have any financial responsibility under the agreement, and it has no responsibility for the financing, promotion, or development of the proposed project.
 
 See Bannon,
 
 246 So.2d at 741. The JAA’s fee simple title to the land is not encumbered by any loans to Majestic, and the JAA is not obligated to Majestic’s creditors.
 
 See id.
 
 On the whole, the agreement does not enable the JAA to become a joint owner with Majestic.
 

 In addition, although we decline to rely exclusively on the test for establishing a joint venture in order to determine whether the agreement violates the joint ownership prohibition, we agree with the district court that the agreement fails the test for establishing a joint venture. While the agreement may meet one or even several of the elements of the test, it clearly does not meet all of them.
 
 [9]
 
 As explained by the district court:
 

 The relationship between the JAA and Majestic is not that of a joint venture because more than one of the necessary indicia of joint venture are missing. First, Jackson-Shaw fails to note that Majestic will be contributing
 
 all
 
 capital costs toward infrastructure and improvements construction. With the exception of the previously budgeted $750,000 road extension to build a public road, and up to 50 acres of wetlands mitigation which would likely be required for any development on the property, JAA expends no additional money
 
 *1094
 
 for capital costs. Majestic, as the capital investor, stands to lose all of its investment should the project be unprofitable and bears that risk alone. Additionally, while the parties did agree to share in the net profits, JAA never agreed to share in the losses (which would be the lost capital contributions made and debt incurred by Majestic) should the project prove unprofitable. (PGL at 30, ¶ 2.15.1.) In addition to not assuming any liability to Majestic’s creditors or for Majestic’s potential financial losses incurred in constructing the commercial development, the JAA will not be liable, under the terms of the Option and PGL, for any tort that occurs to third parties in connection with Majestic’s development.
 
 (See
 
 Option at 11, ¶ 6.3; PGL at 6, ¶ 1.1.29.2; 22-24, ¶ 2.9.)
 
 See Advanced Protection Technologies, Inc. v. Square D Co.,
 
 390 F.Supp.2d 1155, 1161 (M.D.Fla.2005) (no agreement to share in the losses). The JAA has no “control” over the actual development of Woodwings East, other than the specific requirements set forth in the Option and PGL, such as requiring Majestic to adhere to the project’s master plan. Further, there is no evidence whatsoever that JAA is somehow “delegating” any “right of control” to Majestic, as Jackson-Shaw suggests.
 
 See Sasportes v. M/V Sol de Copacabana,
 
 581 F.2d 1204, 1208 (5th Cir.1978).
 

 Not only are JAA’s and Majestic’s “loss exposures” different,
 
 see USA Independence Mobilehome Sales, Inc.,
 
 908 So.2d at 1158, but JAA’s risk that its land will not return a profit, is not a “sharing of the losses” required of a joint venturer.
 
 See S & W Air Vac Systems, Inc.,
 
 697 So.2d at 1316 (property owner’s “disadvantageous position relative to its competitors” should commercial enterprise of licensee prove unprofitable “fails to meet the loss requirement” for joint venture);
 
 Greiner v. General Electric Credit Corp.,
 
 215 So.2d 61, 63 (Fla. 4th DCA 1968) (foregoing rent for period of lease term not an agreement to share losses). Finally, neither JAA nor Majestic has the authority to bind the other in any way in connection with the transaction.
 
 See Kislak,
 
 95 So.2d at 516. While the JAA and Majestic may have a ‘“community of interest in the performance of a common purpose’ ” — the success of Majestic’s Woodwings East commercial development — they do not have a “joint proprietary interest in the subject matter” such that they have “joint control or right of control” in the development.
 
 See USA Independence Mobilehome Sales, Inc.,
 
 908 So.2d at 1158, 93 Fla. Op. Att’y Gen. 44, 1993 WL 369420, at *3 (1993) (though parties have common interest in producing a profit from operation of the transferred property to ensure purchase price will be paid from future profits, transaction is not a joint venture in violation of Article VII, Section 10, because seller does not have any right of control over the property).
 

 Jackson-Shaw I,
 
 510 F.Supp.2d at 730-31.
 

 In sum, we hold that the JAA is not a joint owner with Majestic in violation of article VII, section 10 of the 1968 Florida Constitution by virtue of its obligations under the agreement.
 

 Pledge of Credit
 

 The second question certified by the Eleventh Circuit asks whether the JAA is impermissibly pledging its credit to aid Majestic, thereby violating article VII, section 10 of the Florida Constitution.
 
 Jockson-Shaw II,
 
 508 F.3d at 658. Jackson-Shaw contends that the agreement violates the constitutional prohibition because both aspects of the transaction, the Option and PGL, constitute the use of public credit and funds for the benefit of Majestic without serving a predominantly
 
 *1095
 
 public purpose. In contrast, the JAA argues that it has not lent its credit to Majestic by entering into a long-term ground lease without a guaranteed income, building a public road, and not charging for some mitigation lands within the leased property. The JAA also argues that the paramount public purpose test is inapplicable.
 

 As used in article VII, section 10 of the Florida Constitution, the term credit “implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises.”
 
 Nohrr v. Brevard County Educ. Facilities Auth.,
 
 247 So.2d 304, 309 (Fla.1971). This Court has also defined the lending of credit as follows:
 

 [T]he assumption by the public body of some degree of direct or indirect obligation to pay a debt of the third party. Where there is no direct or indirect undertaking by the public body to pay the obligation from public funds, and no public property is placed in jeopardy by a default of the third party, there is no lending of public credit.
 

 State v. Hous. Fin. Auth. of Polk County,
 
 376 So.2d 1158, 1160 (Fla.1979) (citing
 
 Nohrr,
 
 247 So.2d 304). This Court has also explained that “[i]n order to have a gift, loan or use of public credit, the public must be either directly or contingently liable to pay something to somebody.”
 
 Nohrr,
 
 247 So.2d at 309.
 

 If the State or a political subdivision has not given, lent, or used its credit, a project must merely serve a public purpose.
 
 See State v. Osceola County,
 
 752 So.2d 530, 536 (Fla.1999). This Court has explained that under the public purpose test “it is immaterial that the primary beneficiary of a project be a private party, if the public interest, even though indirect, is present and sufficiently strong.”
 
 Hous. Fin. Auth. of Polk County,
 
 376 So.2d at 1160 (citing
 
 State v. Putnam County Dev. Auth.,
 
 249 So.2d 6 (Fla.1971)). However, this Court has also cautioned that “public bodies cannot appropriate public funds indiscriminately, or for the benefit of private parties, where there is not a reasonable and adequate public interest.”
 
 Id.
 
 Even where there is no proposed public indebtedness, neither the State nor a political subdivision “may expend public funds for or participate at all in a project that is not of some substantial benefit to the public.”
 
 State v. Miami Beach Redevelopment Agency,
 
 392 So.2d 875, 886 (Fla.1980).
 

 On the other hand, if the State or a political subdivision has given, lent, or used its credit, a project “must serve a paramount public purpose and any benefits to a private party must be incidental.”
 
 Osceola County,
 
 752 So.2d at 536. We have explained that under the paramount public purpose test, if the benefits to a private party are the paramount purpose, then the project will not pass constitutional muster.
 
 See Orange County Indus. Dev. Auth. v. State,
 
 427 So.2d 174, 179 (Fla.1983). Furthermore, we have explained that a broad, general public purpose cannot sustain a project that is purely a private enterprise in terms of direct and actual use.
 
 Id.
 
 (citing
 
 State v. Manatee County Port Auth.,
 
 193 So.2d 162 (Fla.1966);
 
 State v. Town of North Miami,
 
 59 So.2d 779 (Fla.1952)).
 

 Most of the cases in which this Court has addressed the prohibition against a public entity giving, loaning or using its credit to aid a private entity have occurred in the context of the issuance of bonds.
 
 See, e.g., N. Palm Beach County Water Control Dist. v. State,
 
 604 So.2d 440, 440-42 (Fla.1992) (determining whether bonds proposed to be issued by a water control district to finance road improvements within a unit of the district contemplated a
 
 *1096
 
 pledge of the district’s credit);
 
 Linscott v. Orange County Indus. Dev. Auth.,
 
 443 So.2d 97, 99-101 (Fla.1988) (assessing whether bonds proposed to be issued by a county industrial development authority to finance the construction of an office building for a multistate insurance company constituted a pledge of credit);
 
 Nohrr,
 
 247 So.2d at 306-09 (analyzing whether bonds proposed to be issued by a county educational facilities authority to finance dormitory-cafeteria projects at a private higher educational institution contemplated the lending or use of credit). The few cases where the challenged arrangements most closely resemble the agreement in this case,
 
 Bailey, Raney, Bannon,
 
 and
 
 Williams,
 
 concern leases or temporary conveyances of land from a public entity to a private entity without the issuance of bonds. As explained above, under
 
 Williams
 
 and
 
 Bannon,
 
 a lease by a public entity to a private entity is not per se invalid under article VII, section 10 of the 1968 Florida Constitution.
 
 See Williams,
 
 291 So.2d at 578;
 
 Bannon,
 
 246 So.2d at 740-41. Thus, it follows that by entering into a lease, a public entity does not necessarily give, lend, or use its credit to aid a private entity.
 

 In finding that the JAA was not pledging its credit through the agreement in the instant case, the district court concluded that as in
 
 Bannon,
 
 the JAA’s participation was limited to that of a lessor and the JAA bore no responsibility for financing, promotion, or development of Majestic’s commercial project.
 
 Jackson-Shaw I,
 
 510 F.Supp.2d at 733. The district court reasoned that the JAA bore no direct or indirect obligation to pay any debt and its fee interest in Woodwings East was not obligated by any potential default by Majestic.
 
 Id.
 
 The district court concluded that the commitment to build a public road was not a pledge of credit and that the JAA’s credit was neither encumbered by the Option in which Majestic had the exclusive right to lease Woodwings East at no cost to Majestic nor by the PGL for a rent allegedly less than market value.
 
 Id.
 

 Jackson-Shaw contends that the district court erred because the JAA takes on both direct and indirect financial obligations through the Option and PGL. With regard to the Option, Jackson-Shaw argues that JAA has to pay up to $750,000 to build a road extension and has to provide wetlands credits. Jackson-Shaw also argues that through the Option, the JAA is pledging not to use the property for other purposes during the term of the agreement. Jackson-Shaw argues that if Majestic decides not to exercise the Option or cannot complete the benchmarks required before it has to execute a binding lease, the JAA will have forfeited its rights to sell the property, lease it at a market rate, or use it for public purposes during the term of the agreement. With regard to the PGL, Jackson-Shaw contends that the JAA has agreed to allow Majestic to recoup all of its expenses with interest and development and management fees before it has to pay a nominal rent. Furthermore, Jackson-Shaw argues that the PGL gives Majestic the authority to pledge to its lenders its right to develop and occupy the property, and if Majestic defaults, the lenders may foreclose, take possession of the property, and recoup debt and costs before the JAA can receive revenue.
 

 With regard to Jackson-Shaw’s argument that the JAA incurs financial obligations under the Option by agreeing to pay up to $750,000 to build a road and to provide fifty acres of wetlands mitigation, at first blush it may appear that the JAA has agreed to expend public funds or public resources. Such obligations appear absent in this Court’s decisions in
 
 Bailey, Raney, Bannon,
 
 and
 
 Williams. See Williams,
 
 291 So.2d at 578 (suggesting that public funds were not spent by the
 
 *1097
 
 municipality in leasing public land to a private corporation);
 
 Bannon,
 
 246 So.2d at 740-41 (observing that the district had no monetary obligations and no financial responsibility under the lease);
 
 Raney,
 
 88 So.2d at 150 (noting that the nonprofit corporation agreed to construct a building on the leased land at its own expense);
 
 Bailey,
 
 111 So. at 120 (remarking that under the contract the city did not have to obtain or appropriate money for the board of trade). However, the JAA had already planned and budgeted to construct a public road through Woodwings East and the JAA already owns any land that will be used for the wetlands mitigation.
 

 More importantly for the analysis of these provisions under the constitutional prohibition, while these aspects of the Option may represent the arguable expenditure of public funds or resources, they do not equate to a gift, loan, or use of credit under the constitution. As we have defined credit and the lending of credit, the constitutional prohibition contemplates not just the use of public funds but the imposition of a new financial liability and a direct or indirect obligation to pay a debt of a third party.
 
 See Hous. Fin. Auth. of Polk County,
 
 376 So.2d at 1160;
 
 Nohrr,
 
 247 So.2d at 309. Under this Court’s narrow definition of this prohibition, the money for the road and land for wetlands mitigation do not constitute credit.
 

 In addition, the other challenged aspects of the Option do not represent the gift, loan, or use of credit. Just because the JAA is agreeing not to use its property for other purposes during the term of the Option does not mean that it is somehow giving, lending, or using its credit. Similarly, just because Majestic may not exercise the Option or may not complete the benchmarks required does not mean that the JAA is somehow giving, lending, or using its credit because it will not be able to sell the property, lease it to someone else, or use it for other purposes during this time period. While these aspects of the Option may be favorable to Majestic, they do not violate the constitutional prohibition.
 

 Similarly, the challenged aspects of the PGL do not represent the gift, loan, or use of credit. Even more clearly than with the Option, the JAA’s role in the PGL is limited to that of a lessor.
 
 See Bannon,
 
 246 So.2d at 741. First, the fact that the JAA has agreed to allow Majestic to recoup all of its expenses with interest and development and management fees before the net revenue is determined does not mean that the JAA has given, lent, or used its credit. Furthermore, Majestic will only pay fifty percent of the net revenue as rent if it is greater than the fixed rent. Through this alternative rental structure, the JAA has not become responsible for financing, promotion, or development of Majestic’s proposed projects.
 
 See id.
 
 Second, Majestic’s ability to pledge to its lenders its right to develop and occupy the property does not contemplate a gift, loan, or use of the JAA’s credit. Under the PGL, the JAA’s fee simple title to the land is not encumbered by any loans to Majestic, and the JAA is not obligated to Majestic’s creditors. Thus, as in
 
 Bannon,
 
 the public entity bears no responsibility to the private tenant’s creditors and its ownership of the land is not committed for such.
 
 See id.
 
 Likewise, the ability of Majestic’s lenders to recoup debt and costs before the JAA can receive revenue rent does not entail the gift, loan, or use of credit.
 

 In sum, we agree with the district court that the JAA has not given, lent, or used its credit to aid Majestic under the Option and PGL.
 

 Because the district court determined that the JAA did not lend its credit, the district court determined that the transaction needed to only serve a public purpose,
 
 *1098
 
 rather than a paramount public purpose.
 
 Jackson-Shaw I,
 
 510 F.Supp.2d at 738 (citing
 
 N. Palm Beach County Water Control Disk,
 
 604 So.2d at 442). The district court determined that the extension of the road into Woodwings East served a public purpose, noting that the JAA had previously budgeted for the road improvement as a planned capital project in accordance with its powers and that it would retain ownership of the road.
 
 Id.
 
 at 734. The district court found that the JAA’s mitigation of wetlands on its property did not constitute a payment of funds to Majestic and served a valid public purpose.
 
 Id.
 
 The district court also determined that the “alleged ‘land bank’ for Majestic, created by the Option encumbering all 328 acres of Woodwings East for five to fifteen years, without payment by Majestic, sufficiently furthers a public purpose by facilitating Majestic’s revenue-producing development.”
 
 Id.
 
 The district court reasoned, “Whether or not the Majestic transaction will in fact meet JAA’s expectations, JAA’s attempt with this transaction to transform a dormant piece of property into a viable and area-compatible revenue-producing industrial and office park sufficiently fulfills a public purpose.”
 
 Id.
 
 The district court determined that the perceived favorability of the terms in the Option and PGL to Majestic did not negate the overall public purpose and that the benefit to Majestic was incidental to JAA’s prime objective and public purpose of raising revenues for the JAA for many years.
 
 Id.
 

 As the district court correctly observed, if the JAA has not given, lent, or used its credit to aid Majestic through the Option and PGL, the agreement must merely serve a public purpose.
 
 See N. Palm Beach County Water Control Dist.,
 
 604 So.2d at 442. While the agreement meets this test, it may be a closer question than in cases such as
 
 Bannon
 
 or
 
 Williams,
 
 where there was an explicit legislative determination of public purpose.
 
 See Williams,
 
 291 So.2d at 578 (finding that through the statutes providing general legislative authority to municipalities, the Legislature had determined that the lease of public lands for private purposes was a valid public purpose);
 
 Bannon,
 
 246 So.2d at 740 (finding it unnecessary to determine whether the development of the leased property served a primarily public or private purpose and noting that the district was exercising a power conferred to it by the Port Facilities Financing Law (chapter 315, Florida Statutes), which provided in pertinent part, that the powers conferred by it and the exercise of those powers were proper public and municipal purposes (citing section 315.14, Florida Statutes));
 
 see also Hous. Fin. Auth. of Polk County,
 
 376 So.2d at 1160 (“A legislative declaration of public purpose is presumed to be valid, and should be deemed correct unless so clearly erroneous as to be beyond the power of the legislature.”). While the Legislature granted the JAA broad powers in its Charter, including the powers to enter into contracts and leases, it did not explicitly determine that the exercise of these powers was a proper public purpose.
 
 See generally
 
 ch. 2004-464, §§ 1-5, at 440-55, Laws of Fla. Rather, the Legislature included in the Charter the following declaration of purpose: “The authority created by this act and the purposes which it is intended to serve is hereby found to be for a county and public purpose.” Ch. 2004-464, § 1(14), at 454, Laws of Fla. Moreover, even though the Charter provides that the provisions of chapter 315 are applicable to the JAA,
 
 see
 
 ch. 2004-464, § 1(13), at 454, Laws of Fla., chapter 315 no longer contains the provision relied upon by this Court in
 
 Bannon, see
 
 § 315.14, Fla. Stat. (1999),
 
 repealed by
 
 ch. 2000-325, § 3, at 3561, Laws of Fla.
 

 Despite the lack of a specific legislative determination of public purpose that explicitly addresses the JAA’s exercise of
 
 *1099
 
 powers in the instant case, we find that the agreement satisfies a public purpose. Jackson-Shaw concedes that the public purpose test is satisfied “by the fact that even the below-market revenue the Authority hopes to receive can be used to reduce the public tax burden.” Appellant’s Initial Br. at 43 n. 17. Jackson-Shaw cites this Court’s decision in
 
 Williams
 
 in which this Court observed that “[i]n fact, it would be beneficial in many instances to lease surplus public property for non-public purposes so that the citizens and taxpayers would realize some tax relief resulting from the income.” 291 So.2d at 578.
 

 In the instant case, the agreement concerns surplus public property: 328 acres of undeveloped, vacant land known as Woodwings East.
 
 Jackson-Shaw I,
 
 510 F.Supp.2d at 697-99, 707-11. The testimony and evidence introduced at trial indicates that before entering into the challenged agreement, the JAA sought to have the property developed and leased in order to generate revenue for the JAA. For example, in 2003, the JAA conducted a workshop at which it discussed strategies for putting some of its real estate assets into production.
 
 Id.
 
 at 699-700. The JAA’s intent was to derive revenue for the airport, and the JAA decided that it would ground lease its property, rather than develop its property itself.
 
 Id.
 
 at 700. As an outcome of the workshop, the JAA created the Enterprise Division to focus on maximizing the value of the JAA’s undeveloped property and to diversify the JAA’s revenue sources.
 
 Id.
 
 at 697, 700. The JAA also sought someone to develop Woodwings East with one of its primary objectives being obtaining a long-term revenue stream for the JAA.
 
 Id.
 
 at 700-01.
 

 The testimony and evidence introduced at trial also indicates that the JAA envisioned the Option and PGL with Majestic as enabling it to produce revenue. For instance, the proposal to the JAA’s board of directors in 2005 characterized the arrangements as “providing] JAA with a vehicle to generate significant cash flow for vacant non-producing land with a large industry leader with a successful track record of performing as promised and generating significant cash flow for landowners.”
 
 Id.
 
 at 704. The JAA board approved the Option and PGL in 2005 and approved the revised Option and PGL in 2006.
 
 Id.
 
 at 705-06. The board chairman, Mary Burnett, testified that she voted for the project because
 
 “
 
 T thought in the best interest of the Jacksonville International Airport this was the right thing to do.... This was a good use for the property.... [I]t’s been vacant for many years. It was going to generate revenue. It was going to give people jobs. It was a good thing for the community.’ ”
 
 Id.
 
 at 705.
 

 Thus, in entering into the agreement with Majestic, the JAA intended to generate revenue. While the JAA may not generate revenue if Majestic chooses not to exercise the Option and enter into a PGL, the agreement offers the JAA the potential to generate revenue if Majestic exercises the Option and enters into a PGL. To the extent that the revenue may ultimately provide tax relief, the agreement fulfills a valid public purpose.
 
 See Williams,
 
 291 So.2d at 578.
 
 [10]
 

 Moreover, under the public purpose test it is immaterial that the primary beneficiary of a project is a private party, as long as the public interest is sufficiently strong.
 
 *1100
 

 See Hous. Fin. Auth. of Polk
 
 County, 376 So.2d at 1160. Thus, because we find that the public interest in producing revenue for the JAA is sufficiently strong, the alleged favorability of the terms to Majestic cannot cause the agreement to fail the public purpose test.
 

 Finally, while Jackson-Shaw does not contest that the agreement serves a public purpose, Jackson-Shaw argues that the Option and PGL fail to serve a paramount public purpose. Because we find that the JAA has not given, lent, or used its credit to aid Majestic through the Option and PGL, we need not determine whether the agreement serves a paramount public purpose.
 
 See N. Palm Beach Water Control Dist.,
 
 604 So.2d at 442.
 

 In sum, we hold that the JAA has not given, lent, or used its credit to aid Majestic in violation of article VII, section 10 of the 1968 Florida Constitution. The agreement serves a public purpose and does not violate the constitution.
 

 CONCLUSION
 

 For the reasons explained above, we answer both of the certified questions in the negative. We conclude that the JAA has not become a joint owner with Majestic through the challenged agreement, and it has not given, lent, or used its credit to aid Majestic through the challenged agreement. Having answered the certified questions, we return this case to the Eleventh Circuit.
 

 It is so ordered.
 

 WELLS, ANSTEAD, PARIENTE, LEWIS, and CANADY, JJ., concur.
 

 QUINCE, C.J., concurs in result only.
 

 POLSTON, J., did not participate.
 

 [1]
 

 . While the certified questions essentially ask us to resolve the pending appeal in the circuit court, we agree these are issues of law since the facts are undisputed and merely require an interpretation and application of the relevant constitutional provisions.
 

 [2]
 

 . The agreement at issue is between the JAA and Woodwings East Development, LLC, a Delaware limited liability company formed by Majestic.
 
 Id.
 
 at 695 n. 1.
 

 [3]
 

 . After initiating the lawsuit, Jackson-Shaw made an offer to lease twenty-five acres of Woodwings East and proposed a rolling option for future leases.
 
 Id.
 
 at 707. The JAA, through counsel, wrote that it was unable to respond to the proposal because of the instant litigation.
 
 Id.
 

 [4]
 

 . The subsections contained in the remainder of this provision are inapplicable to this case.
 

 [5]
 

 . Subsections (a) through (d) provide that article VII, section 10 does not prohibit laws authorizing the investment of public trust funds, the investment of other public funds in obligations of the United States, the issuance of bonds to finance local airports or port facilities, the issuance of bonds for industrial or manufacturing plants if the interest is exempt from income taxes and bonds are payable solely from revenues therefrom, and the joint ownership with or pledge of taxing power or credit to any private entity for the ownership, construction, and operation of electrical energy generating or transmission facilities. Art. VII, § 10(a)-(d), Fla. Const, (amended 1974).
 

 [6]
 

 . Sharing in losses "means that each party is responsible or liable for the losses created by the venture and is exposed to liability, if any, to creditors or third parties." S & W
 
 Air Vac Sys., Inc. v. Dep’t of Revenue,
 
 697 So.2d 1313, 1316 (Fla. 5th DCA 1997) (citing
 
 Phillips
 
 v.
 
 U.S. Fid. & Guar. Co.,
 
 155 So.2d 415, 419 (Fla. 2d DCA 1963)).
 

 [7]
 

 . Although the Attorney General used the terms joint venturer and partner to analyze the constitutional prohibition, it appears that, at least in part, the Attorney General was merely responding to the manner in which the questions were presented. The inquiring person addressed in one advisory opinion had asked about a joint venture, and the inquiring person in another opinion had asked about a partnership. Op. Att'y Gen. Fla. 2002-07 (2002); Op. Att'y Gen. Fla. 93-44 (1993). Thus, to the extent that the Attorney General was simply responding to the precise questions presented, the advisory opinions may not reflect a decision to equate the term joint owner with the terms partner or joint venturer.
 

 [8]
 

 . To the extent that this Court may have suggested in
 
 Raney
 
 that a lease to a private entity for profit necessarily violates the constitutional prohibition,
 
 see Raney,
 
 88 So.2d at 151, we rejected such a proposition in later cases such as
 
 Williams
 
 and
 
 Bannon.
 

 [9]
 

 . The PGL also explicitly states that “in no event shall this Agreement or the Parties’ relationship hereunder be deemed to constitute a partnership or joint venture.”
 

 [10]
 

 . It appears that any tax relief is an indirect consequence of the JAA’s revenue production contemplated in the Option and PGL. The JAA does not possess "independent taxing authority, and receives its revenues from state and federal grants, landing fees, rentals, concession fees and facility lease fees.”
 
 Jackson-Shaw I,
 
 510 F.Supp.2d at 697. Thus, any tax relief would presumably come from the JAA’s reduced need for state and federal grants funded by tax monies.