Dear Mr. Thomas:
On behalf of the North Broward Hospital District, you ask substantially the following question:
 May the North Broward Hospital District lease radiation oncology equipment and space to a limited liability company composed of a partnership between a wholly-owned, not-for-profit subsidiary of the district and a private for-profit medical provider without violating Article VII, section 10, Florida Constitution?
In sum:
 The partnership between a wholly-owned, not-for-profit subsidiary of the North Broward Hospital District and a private for-profit medical provider would appear to constitute a joint ownership in violation of Article VII, section 10, Florida Constitution, thereby precluding the leasing of district property to such partnership.
You state that North Broward Hospital District (District) has purchased oncology treatment equipment to be installed in district facilities to operate as Radiation Therapy Service Centers (Centers), providing cancer treatment to the general public in the district's service area.[1] A public-private partnership Radiation Oncology Services (ROS), composed of the District's wholly-owned, not-for-profit support organization Broward Health Support Services (BHSS) and a for-profit medical provider HealX Oncology, is proposed to lease the equipment and facilities and to operate such for the charitable, public purposes of the District.
Under the agreement between the District and ROS, BHSS is the controlling partner with 51% ownership of ROS; 49% of ROS owned by HealX. Profits and losses, as well as the dissolution value of ROS will be allocated in proportion to the respective ownership share. Lease payments are to be "commercially reasonable and at fair market value." ROS's management board will consist of three members appointed by BHSS and two members appointed by HealX. You indicate that as controlling partner, BHSS will set charges for clinical services, terminate or add clinical service lines, terminate management agreements, and control other fundamental matters.[2]
Finally, you indicate that HealX would have authority over the day-to-day operation of ROS.[3]
While your question primarily focuses on the ability of the District to enter into a lease with ROS, it would appear that the initial question to be resolved is whether the District may enter into the partnership with the for-profit HealX without violating the prohibition in Article VII, section 10 of the Florida Constitution.
The District is a legislatively created special taxing district which enabling statutes were recodified in Chapter 2006-347, Laws of Florida.[4] It is governed by a seven-member board of commissioners[5] with, among others, the power to: lease district real and personal property;[6] "borrow money, incur indebtedness, and issue notes, revenue certificates, bonds, and other evidences of indebtedness of said district;"[7] and "establish and support subsidiary or affiliate organizations to assist the district in fulfilling its declared public purpose of providing for the health care needs of the people of the district[.]"[8] The District may
 "establish and support subsidiary or affiliate organizations to assist the district in fulfilling its declared public purpose of providing for the health care needs of the people of the district and, to the extent permitted by the State Constitution, to support not-for-profit organizations that operate primarily within the district, as well as elsewhere, and that have as their purposes the health care needs of the people of the district by means of nominal interest loans of funds, nominal rent leases of real or personal property, gifts and grants of funds, or guaranties of indebtedness of such subsidiaries, affiliates, and not-for-profit organizations (any such support of a subsidiary or affiliate corporation or nonaffiliated, not-for-profit corporation is hereby found and declared to be a public purpose and necessary for the preservation of the public health and for public use and for the welfare of the district and inhabitants thereof)[.]"[9]
(e.s.)
The District is also authorized
 "to the extent permitted by the State Constitution, to participate as a shareholder in a corporation, or as a joint venture in a joint venture, which provides health care or engages in activities related thereto, to provide debt or equity financing for the activities of such corporations or joint ventures, and to utilize, for any lawful purpose, the assets and resources of the district to the extent not needed for health care and related activities[.]"[10] (e.s.)
Thus, within the limits prescribed by the Florida Constitution, the North Broward Hospital District has broad authority to enter into business arrangements with other business entities and to provide support for other business entities which provide health care services. However, this broad authority may only be exercised within the scope of the provisions of the Florida Constitution.
Article VII, section 10, Florida Constitution, provides in part:
 "Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person. . . ."
The Florida Supreme Court's has applied the provisions of Article VII, section 10, Florida Constitution, in determining the propriety of a business arrangement between a public entity and a private company in Jackson-Shaw Company v. Jacksonville AviationAuthority.[11] The Court noted:
 "Although the 1968 Florida Constitution added limiting constructions and exceptions to the broad prohibition contained in the 1885 Florida Constitution, the general language in the prohibition against public entities becoming joint owners with or pledging their credit to private entities was not substantially altered. Thus, like the 1885 provision before it, the 1968 prohibition `acts to protect public funds and resources from being exploited in assisting or promoting private ventures when the public would be at most only incidentally benefitted.'"[12]
In Jackson-Shaw, the Florida Supreme Court was presented with two certified questions by the Eleventh Circuit Court of Appeals. The initial question to be addressed by the Court was whether a business agreement entered into by the Jacksonville Aviation Authority (JAA) for a private commercial development company's long-term use of vacant land owned by the authority would violate the constitutional prohibition against joint ownership. In determining that the arrangement did not constitute joint ownership, the Court returned to the specific language of the constitution to advise that "[t]he language does not explicitly prohibit joint ventures or partnerships."[13] The court noted the potential pitfalls of equating the term joint owner with the term joint venture or the term partner, in that a court may fail to recognize joint ownership arrangements that would jeopardize public funding, but do not strictly meet the test for a joint venture.[14]
In determining whether the arrangement between the JAA and Majestic (the private commercial development company) violated the constitutional prohibition, the Court first looked to whether the JAA had incurred financial obligations as a result of the agreement so as to make the authority a joint owner with Majestic. Although the JAA had obligated itself to construct a road extension on the property, those expenditures had previously been planned and budgeted and the Court determined that the JAA was not using public funds so as to create a prohibited joint ownership: "[t]he Option is merely obligating the JAA to do something it already intended to do."[15] Wetlands mitigation was also contractually required of the JAA which had agreed to designate land it owned as a conservation easement. Despite the fact that the JAA owned the land and the Court recognized that using these wetlands for mitigation could arguably be characterized as using public resources to assist in a private venture, the Court did not find that this provision rendered the JAA and Majestic joint owners.[16]
The Court looked to the nature of the relationship that would arise under the agreement between the JAA and Majestic in analyzing whether the arrangement violated the constitutional prohibition in Article VII, section 10 of the Florida Constitution. The Court reviewed the particular provisions of the agreement and determined that, "with the possible exceptions of the road construction and wetlands mitigation, the JAA does not have any financial responsibility under the agreement, and it has no responsibility for the financing, promotion, or development of the proposed project."[17] The JAA's fee simple title to the real property was not encumbered by any loans to Majestic, and the JAA was not obligated to the creditors of the development company. Thus, "[o]n the whole, the agreement does not enable the JAA to become a joint owner with Majestic."[18]
Finally, the Court declined to rely exclusively on the test for establishing a joint venture to decide whether the arrangement violated the joint ownership prohibition. The Court noted, however, that the agreement failed the test for establishing a joint venture between the JAA and Majestic.[19]
This office and the courts have delineated those factors which must be present to constitute a joint venture. In Attorney General Opinion 93-44 (cited in the Jackson-Shaw case), this office stated that in order to have a joint venture, the entities must have: a community of interest in the performance of the common purpose; joint control or right of control; a joint proprietary interest in the subject matter; a right to share in the profits; and a duty to share in any losses incurred in the venture.[20]
As noted above however, the Florida Supreme Court has determined that the test for determining joint venture status is not dispositive of the question of a violation of the constitutional prohibition against joint ownership, as the absence of one of the specified characteristics does not necessarily mean that a business relationship would not otherwise be prohibited by the constitution. Rather, it is the nature of the relationship which must be evaluated.
As noted in Jackson-Shaw, a lease by a public entity to a private entity is not per se invalid under Article VII, section 10, Florida Constitution.[21] In this instance, however, the District is not merely leasing its facilities and equipment to a private entity. The underlying arrangement between the District, through its wholly-owned subsidiary BHSS and HealX, contains several components which evidence a prohibited joint ownership. You indicate that BHSS will be the sole controlling partner with 51% ownership of ROS. However, HealX will own 49% of the company and will appoint managers to the managing board. BHSS and HealX share profits and losses, as well as dissolution value of the business in proportion to their ownership shares and will exercise joint control (albeit in specified areas of operation) over the management and operation of the company. Given the clear partnership between BHSS and HealX, they would necessarily have a joint proprietary interest in the success of the operation of ROS. As you have noted, the District determined that it was in its best interest to "secure the subject-matter expertise and operational prowess of HealX, as well as obtain the use of private monies to assist in the funding" of the project.
In light of the above, it is my opinion that the business partnership between the BHSS and HealX constitutes an improper joint ownership on the part of the North Broward Hospital District prohibited by Article VII, section 10, Florida Constitution. The District's lease of its property to such an entity, therefore, would not be authorized.
Sincerely,
 Bill McCollum Attorney General
BM/tals
[1] You state that ROS will provide free care for the underprivileged and indigent district patients.
[2] Fundamental matters are stated to include: capital and operating budgets, timing and amount of distributions, selection of key executives, acquisition or disposition of equipment and space, execution of contracts in excess of $250,000, changes to service mix, and amendment of the partners' operating agreement.
[3] "Day-to-day operation" includes payment of ordinary business expenses, maintenance of banking accounts, and various other ministerial duties.
[4] See s. 2, Ch. 2006-347, Laws of Fla.
[5] Section 3, Ch. 2006-347, Laws of Fla.
[6] Section 4(1), Ch. 2006-347, Laws of Fla.
[7] Id.
[8] Id.
[9] Id.
[10] Id.
[11] 8 So. 3d 1076 (Fla. 2008).
[12] Jackson-Shaw, supra n. 8 at 1086, citing Bannon v.Port of Palm Beach Dist., 246 So. 2d 737, 741 (Fla. 1971).
[13] Jackson-Shaw at 1091.
[14] Id.
[15] Jackson-Shaw at 1092.
[16] Jackson-Shaw at 1093.
[17] Id.
[18] Id.
[19] Id.
[20] Jackson-Shaw at 1089. And see Florida Tomato Packers,Inc. v. Wilson, 296 So. 2d 536, 539 (Fla. 3d DCA 1974).
[21] Jackson-Shaw at 1092.